UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

JULIA ALVAREZ,

                            Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

**MEMORANDUM & ORDER**
14-CV-3542 (MKB)

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Julia Alvarez filed the above-captioned action seeking review pursuant to 42

U.S.C. § 405(g) of a final administrative decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for Social Security disability insurance benefits.  The

Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, claiming that the decision of Administrative Law Judge ("ALJ") Mark

Solomon is supported by substantial evidence and should be affirmed.  (Comm'r Not. of Mot. for

J. on Pleadings, Docket Entry No. 19; Comm'r Mem. in Support of Mot. for J. on the Pleadings

("Comm'r Mem."), Docket Entry No. 20.)  Plaintiff cross-moves for judgment on the pleadings,

arguing that (1) the ALJ erred in failing to accord the opinion of Plaintiff's treating physician,

Dr. Joann Titelis, M.D., appropriate weight, (2) the ALJ failed to develop the record of

Plaintiff's mental illness, and (3) having failed to adequately develop the record, the ALJ

improperly assessed Plaintiff's credibility.  (Pl. Cross-Mot. for J. on Pleadings, Docket Entry

No. 21; Pl. Mem. in Support of Cross-Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry

No. 22.)  For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff is a 50-year-old woman who graduated from high school and completed two years of college. (R. 18, 31.) Plaintiff last worked in April of 2011 as a midwife assistant.[1] (R. 32, 125.) On November 16, 2011, Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI"), alleging a disability that began on April 16, 2011. (R. 90–105.) Plaintiff reported that she stopped working in April of 2011 due to her anxiety, agoraphobia, depression, chronic anemia and hypertension. (R. 135.) On February 17, 2012, Plaintiff's applications for DIB and SSI were denied. (R. 55–62.) On March 22, 2012, Plaintiff requested a hearing before an ALJ. (R. 63–64.) The request was granted and, on August 8, 2012, the ALJ held an administrative hearing. (R. 16, 74.) By decision dated September 11, 2012, the ALJ found that Plaintiff was not disabled and denied Plaintiff's applications for DIB and SSI. (R. 13–22.) On March 24, 2014, the Appeals Council denied review of the ALJ's decision. (R. 1–3.)

### a. Plaintiff's testimony

During the August 8, 2012 administrative hearing, Plaintiff testified that she suffers from back, leg and hip pain, as well as anemia, dizziness, fatigue, shortness of breath, stress, anxiety attacks and agoraphobia. (R. 33, 40, 43–44.) In April of 2011, Plaintiff stopped working due to her back pain, stress, and fatigue, and because she was simultaneously taking care of her children

---

[1] A work history report indicates that Plaintiff worked as a "Medical/Midwife assistant" until June 23, 2011. (R. 174.)

and elderly father.[2]  (R. 33.)  According to Plaintiff, after she stopped working, she took care of her children by herself.  (R. 36.)

Many of Plaintiff's ailments are connected to her fibroid condition, which manifested in her twenties, but worsened after Plaintiff had a child.  (R. 38.)  Plaintiff testified that she has anemia from her fibroids that affects her daily life, and that some days are worse than others.  (R. 39.)  During the month, her symptoms are worst for the ten days before and after her menstrual period.  (*Id.*)  During that time, Plaintiff gets "dizzy spells," and is "lightheaded."  (*Id.*)  This affects the activities she can do, including carrying objects and walking.  (*Id.*)  When walking, Plaintiff needs to stop "to catch [her] breath" or recuperate before continuing.  (*Id.*)  The remaining days in each month are "fine."  (*Id.*)

Plaintiff is the primary care provider for her three children, who she testified were sixteen, thirteen and five-years-old.  (R. 41–42.)  When Plaintiff's doctors recommended that she undergo a hysterectomy to address the fibroids and anemia, she was nervous about the operation, in part because she was the sole provider for her children.  (R. 45–46.)  Plaintiff decided against having the procedure.  (R. 46.)  Plaintiff indicated that if she leaves her house she "slow[s] down," and stated that her children see her dizzy spells and shortness of breath.  (R. 45.)

Plaintiff has back, leg and hip pain every day.  (R. 43.)  Plaintiff previously had anxiety attacks every day, but testified that they now occur "at least twice a day," sometimes lasting the entire day and other times only "a couple hours."  (R. 41.)  During these attacks, Plaintiff feels like she "just need[s] to escape," and she will leave her house or "remove [her]self from the

---

[2]  Plaintiff later corrected her testimony, stating that her father left her apartment in September of 2010.  (R. 35.)

situation . . . ." (*Id.*)  Plaintiff sees a therapist every week and a psychiatrist once a month concerning her stress, fatigue, anxiety and agoraphobia.  (R. 40.)

Plaintiff normally stays at home, and can complete household chores.  (R. 42.)  Plaintiff does laundry, goes shopping and prepares meals.  (*Id.*)  Plaintiff believes those chores are "somewhat" similar to work, and that she could perform a part-time job.  (R. 46.)  Asked whether she could have a full-time job if she did not have other obligations to her children, Plaintiff stated she could.  (R. 47.)

**b.   Plaintiff's work history**

Plaintiff last worked in 2011 as a midwife assistant.  (R. 32, 125.)  Before becoming a midwife assistant, Plaintiff was a medical assistant in the same facility.  (R. 32.) As a medical assistant, Plaintiff worked between twelve and sixteen hours per day, three to four days per week.  (R. 136, 175.)  She worked in "Labor and Delivery," assisting with deliveries, and "stocked rooms."  (R. 175.)  Plaintiff frequently lifted 175 pounds and helped lift patients to their beds and reposition them.  (*Id.*)  Prior to her medical assistant position, Plaintiff was a switchboard operator in the same facility for six months, and prior to that, Plaintiff was unemployed for four years.  (R. 32, 125.)  Plaintiff held a job listed as "unknown" for one year.  (R. 136.)

**c.   Medical evidence**

**i.   Treatment prior to disability onset date**

In her disability report, Plaintiff asserts that in March of 2007, she visited Montefiore Family Health Center to treat her anemia and hypertension and receive an evaluation and blood transfusion.  (R. 138.)  According to Plaintiff, she was seen by Dr. Barakat.  (*Id.*)  A New York State Office of Disability Determinations document indicates that Montefiore could not locate

Plaintiff's "chart" and produced no medical records. (R. 379.)

In addition, Plaintiff had an appointment at Morris Heights Health Center on or about February 4, 2011. (R. 306–07.) Plaintiff was referred to the center for a pelvic ultrasound and sonogram. (R. 308, 313.) A report dated February 16, 2011, and signed by Dr. Jason Hodges, M.D., details the results of Plaintiff's February 11, 2011 pelvic ultrasound. (R. 308.) The ultrasound revealed an enlarged uterus with "at least nine discrete fibroids" and a "slightly complex cyst on the right ovary." (*Id.*) A report dated March 30, 2011 and signed by Dr. Stephen Robinson, M.D., details the results of Plaintiff's March 25, 2011, pelvic sonogram. (R. 313.) The report states that "there is limited evaluation of the uterus with evidence of fibroids which have been previously noted." (*Id.*) There was also a "hypoechoic complex cystic mass" on the right ovary, and no pelvic fluid collection was identified. (*Id.*) The report recommends further evaluation with a computerized tomography ("CT") scan. (*Id.*)

### ii. Treatment after disability onset date

#### 1. Federation of Employment and Guidance Services

In 2011, Plaintiff met with various healthcare personnel at the Federation of Employment and Guidance Services ("FEGS"). FEGS medical records indicate that Plaintiff visited a FEGS facility on September 12, 2011. (R. 200–01.) At that time, Plaintiff reported being homeless for one year. (R. 209.) A number of items appear in the "medical summary," including hypertension, lumbago, agoraphobia with panic disorder, leiomyoma of the uterus, iron deficiency, obesity, alcohol abuse, chronic liver disease and cirrhosis. (R. 200.) Plaintiff stated that she stopped working due to anxiety, and complained that she was having difficulty with adult daily life skills because of her anemia, anxiety and back problems. (R. 214, 218–19.) Plaintiff stated that she was able to, among other things, wash dishes and clothes, sweep,

vacuum, cook, get dressed and groom herself.  (R. 218–19.)  Plaintiff complained that she was

not feeling well due to back pain.  (R. 242.)

In addition to documenting Plaintiff's physical condition, the FEGS medical records also

include information about Plaintiff's mental health.  The records note that for three months,

Plaintiff was receiving treatment for anxiety from Dr. Thomas Cullinan, Ph.D., who is listed as a

treating physician,[3] and note that Plaintiff had a history of voices in her head and felt depressed

"more than half the days" of the prior two weeks.[4]  (R. 217–18.)  Plaintiff also reported

experiencing difficulty concentrating on things "nearly every day" for the prior two weeks.  (*Id.*)

Plaintiff received a "PHQ-9" score of "12" with "moderate" depression severity, and the notes

state, "advise physician of score and to consider psychiatric referral."  (R. 218.)  Plaintiff's

mental health was noted as a "barrier to employment" that "significantly affect[s] [her]

functioning."  (R. 203, 219–20.)

### A.   Dr. Lavonna Branker

The FEGS records include comments signed by Dr. Lavonna Branker, M.D. regarding

Plaintiff's September 12, 2011 visit to FEGS.[5]  (R. 225–33.)  Dr. Branker noted that Plaintiff

---

[3]  The notes also contain contact information for Dr. Cullinan.  (R. 218.)  The notes are unclear as to whether Dr. Cullinan was currently treating Plaintiff, but as to "Year" of his treatment, the notes state "Current."  (R. 217.)

[4]  Plaintiff responded that over the prior two weeks, she had "several days" of being bothered by having "little interest or pleasure in doing things," "trouble falling or staying asleep, or sleeping too much," "feeling tired or having little energy," "poor appetite or overeating," and "feeling bad about yourself — or that you are a failure or have let yourself or your family down." (R. 217.)

[5]  The FEGS records are composed of printouts of computerized data pertaining to distinct categories of information about Plaintiff.  The end of each section contains information about the FEGS personnel that "completed" or "signed" that section.  Numerous sections read

appeared to have menorrhagia from fibroids. (R. 226.) Dr. Branker noted that Plaintiff had

non-radiating lower back pain whose "sxs are worse w[ith] bending," and "prolonged walking

[and] standing." (R. 227.) Plaintiff rated her pain on a scale of one to ten as varying between

"7" and, at its worst, "9," which represented "[u]nbearable [p]ain." (*Id.*) Plaintiff complained of

recurring anxiety, panic attacks, "intermittent depressive [symptoms], and agoraphobia." (*Id.*)

Dr. Branker addressed Plaintiff's mental health. In the section related to Plaintiff's

psychiatric and neurological system, Dr. Branker noted in the "abnormal findings" section that

Plaintiff was "euthymic," and presented "nl range of affects, clear & coherent." (*Id.*) Plaintiff

complained of having anxiety for over fifteen years, and began treatment with a clinical

psychologist on June 22, 2011. (*Id.*) Dr. Branker noted that Plaintiff had no history of

psychological treatment, hospitalizations, "SA" or hallucinations, but complained of having

recurrent anxious mood, panic attacks, intermittent depressive symptoms, and agoraphobia. (*Id.*)

Dr. Branker also signed FEGS records for Plaintiff's chemistry and hematology tests

from Plaintiff's September 12, 2011 visit.[6] (R. 221–23.) All the results are listed as

"[a]bnormal." (*Id.*) They include Plaintiff's abnormal hemoglobin and hematocrit results. (*Id.*)

Plaintiff's hemoglobin lists a "Positive Result" of 4.4 and a "Lab Results Range" of 12.0–16.0.

(R. 222.) Plaintiff's hematocrit lists a "Positive Result" of 16.9 and a "Lab Results range" of

---

"Completed . . . by Lavonna Branker, Hospital Physician . . ." or "Electronically signed . . . by
Lavonna Branker, Hospital Physician . . . ." (*See e.g.*, R. 226.)

[6] These test results are duplicated throughout the FEGS records and "electronically
signed" by Maria Marquez, Julieanna Currey, Hospital QHP/OHT, Institute for Family Health,
"Lab results Auto Update, ALLSector Staff" and Dr. Branker. (R. 220–23, 228–32.)

38.0–47.0.[7]  (*Id.*)  Plaintiff's iron and platelet results were also abnormal.  (R. 221–22.)  In a September 19, 2011 note, Dr. Branker comments that she was unable to contact Plaintiff on September 13, 2011, about her test results, but left a message asking Plaintiff to call the clinic "right away."  (R. 230.)  Dr. Branker also noted that she sent a referral letter for anemia.  (*Id.*)

Dr. Branker made final diagnoses of Plaintiff's ailments, listing alcohol abuse and chronic liver disease as unstable, and lumbago, iron deficiency anemia, hypertension, and leiomyoma as stable.  (R. 231–32.)  Plaintiff's lower back pain had no "functional deficits by exam."  (R. 232.)  In a section about Plaintiff's "Employment Disposition," Dr. Branker noted that Plaintiff's anemia due to fibroids required stabilization "before [Plaintiff] is medically cleared," and further noted that Plaintiff had full range of motion in all peripheral joints and the spine.  (*Id.*)  In that same section, Dr. Branker addressed Plaintiff's mental impairments, listing Plaintiff's panic disorders "with agoraphobia," hypertension and obesity as "Stable Medical Conditions Impacting Employment" and that Plaintiff's mental issues "can be accommodated in a low mental stress work setting."  (*Id.*)  Dr. Branker diagnosed Plaintiff's "uterine fibroids complicated moderate iron deficiency anemia" as an "unstable or untreated" medical condition requiring a "Wellness Plan," and affecting employment.[8]  (R. 233.)

### B.   WeCARE Wellness Rehabilitation Plan

The FEGS records include a "WeCARE Wellness Rehabilitation Plan," dated September 19, 2011, signed by Dr. Branker.  (R. 237–47.)  Plaintiff's hypertension, "LBP w.o functional

---

[7]  A document appearing to list test results also marks "Abnormal Flag" for both hemoglobin and hematocrit.  (R. 23)

[8]  In the comment section of that diagnosis, Dr. Branker notes, "The most recent HCT on Tx and the date it was drawn, should be obtained from [Plaintiff's primary care provider] with the completion of the anemia plan."  (R. 233.)

deficits by exam," obesity, and "[e]levated GGTP w/LFTs ownl, r/o [alcohol] related liver d[isease]" are noted as "stable" conditions impacting Plaintiff's employment. (R. 240.) The recommended treatment plan for these appears to be for Plaintiff to follow up with her primary care physician.[9] (*Id.*) In addition, this section also lists (1) "R/o Panic d/o w[ith] [a]goraphobia," with a direction for Plaintiff to follow up with her primary care provider and "Psych," and (2) "active [alcohol] abuse by hx," which has a treatment plan that references a certified alcoholism and substance abuse counselor. (*Id.*) Plaintiff's "uterine fibroids complicated moderate iron deficiency anemia" is noted as unstable, untreated and requiring a wellness plan, and Plaintiff was directed to follow up with her primary care provider, gynecologist and the "ER immediately." (*Id.*) The plan lists a "start date" of September 20, 2011 and a stabilization date of December 19, 2011. (*Id.*)

As to "Employment Disposition," the plan notes that there is an "unstable medical and/or mental health conditions that require treatment (a wellness plan) before a functional capacity outcome can be made." (R. 244.) In support of that disposition, the plan notes that Plaintiff has "sig anemia due to fibroids" that "requires TX and stabilization before she is medically cleared." (*Id.*) It further notes that Plaintiff has full range of motion in all "periph jts and the spine[, and] [t]he psych issues can be accommodated in a low mental stress work setting."[10] (*Id.*)

A "social work summary" notes that Plaintiff complained that her anemia, anxiety and back problems were barriers to employment. (R. 245.) The plan states that Plaintiff "has unstable medical health conditions that require treatment . . . before a function capacity outcome

---

[9] The treatment plan information states only, "F/u w/PCP." (R. 240.)

[10] The plan lists "none" for travel accommodations or limitations. (R. 244.)

can be made." (R. 244.) It listed her "psychosocial barriers to employment," as "medical and/or mental health conditions that significantly affect functioning." (R. 245.)

The wellness plan includes notes that appear to be from a FEGS case manager.[11] (R. 242.) The case manager noted that Plaintiff has ongoing psychiatric treatment with Dr. Cullinan, and that Plaintiff chose "Dr. Graziano" of Mount Sinai School of Medicine for further medical care. (*Id.*) The case manager noted that he or she stressed the importance of Plaintiff attending her appointments with her treatment provider and "WeCARE." (*Id.*)

### C. Jorge Farrat

A "WeCARE Wellness Re-Exam" report indicates that Plaintiff visited Jorge Farrat of the Institute for Family Health on February 3, 2012.[12] (R. 455–56.) Farrat concluded that Plaintiff had "[u]terine fibroids complicated with severe iron deficiency anemia," and noted that Plaintiff's iron deficiency anemia was unstable. (R. 455.) Farrat noted that this diagnosis affected Plaintiff's employment and recommends Plaintiff see an obstetrician. (R. 456.) Farrat did not note any required reemployment accommodations or travel limitations, but noted that Plaintiff had "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." (R. 455.)

### 2. William R. Ryan Community Health Center

Plaintiff visited various doctors at William R. Ryan Community Health Center (the "Ryan Center") in 2011 and 2012. These visits appear to have been related to Plaintiff's current

---

[11] The notes reference a "CM" that interviewed, called, and provided Plaintiff with information. (R. 242.) Unlike other sections within the wellness plan, the note section does not bear Dr. Branker's signature, or any other signature. (*Id.*) Based on the totality of the notes and the wellness plan, it appears that a case manager, or "CM," completed this information.

[12] It is not apparent from the document whether Farrat is a doctor. (R. 455–56.)

disability.

## A. Dr. Alan Tso, M.D.

On October 25, 2011, Plaintiff had a "walk-in" appointment at the Ryan Center with Dr.

Alan Tso, M.D "to establish care" and undergo a tuberculosis-related "PPD" skin test for her

shelter. (R. 190.) Plaintiff noted her history of hypertension, anemia, anxiety and depression,

but had no acute complaints that day. (*Id.*) Dr. Tso noted Plaintiff's past medical history,

including hypertension, anemia secondary to fibroids and heavy menstruation, anxiety,

depression, eczema and agoraphobia. (*Id.*) He noted that Plaintiff had hypertension since she

was a teenager, and at that time had both systolic and diastolic high blood pressure. (*Id.*)

Plaintiff complained of getting shortness of breath when going up stairs and that since August of

2011, she would have to stop walking every few blocks instead of "being unlimited." (*Id.*)

Plaintiff complained of chest pains and palpations during anxiety attacks, and of sometimes

having "headaches" and blurriness of some kind.[13] (*Id.*) He notes Plaintiff's 2007 blood

transfusion for severe anemia. (*Id.*) Plaintiff had not been taking her medication at the time she

met with Dr. Tso because she "ran out" of medication. (*Id.*) Dr. Tso noted that since August of

2011, Plaintiff had been living in a shelter with her three children. (*Id.*) He noted that Plaintiff

smoked five or fewer cigarettes some days and one to two cigars each day, and consumed one

alcoholic drink per week. (*Id.*)

Dr. Tso appears to have conducted a physical examination, noting that Plaintiff had

"fibroids palpable in lower abd[omen]/pelvis." (*Id.*) Dr. Tso also noted that Plaintiff was

---

[13] Portions of the document containing Dr. Tso's notes are incomplete. The note states that Plaintiff "sometimes gets headaches and blurry." (R. 190.)

"tachycardic"[14] on examination, possibly due to Plaintiff's anxiety. (R. 191.) Dr. Tso also made various "assessments" of Plaintiff, listing hypertension, anemia due to iron deficiency, tobacco use disorder and depression with anxiety. (R. 190.) Dr. Tso ordered a number of tests for Plaintiff's hypertension. [15] (*Id.*) Dr. Tso prescribed 5 milliliters of ferrous sulfate syrup three times a day for Plaintiff's anemia due to iron deficiency. (*Id.*) He referred Plaintiff to see someone in the psychiatry department for her depression with anxiety. (*Id.*) Plaintiff was scheduled to return to the clinic on October 27, 2011, for her test results. (*Id.*)

Plaintiff appears to have had a second appointment with Dr. Tso on or about December 14, 2011. (R. 286–87.) At that time, Dr. Tso signed a "Treating Physician's Wellness Plan Report" ("Wellness Plan") for Plaintiff. (*Id.*) Plaintiff was diagnosed with "uterine fibroids complicated moderate iron deficiency anemia." (R. 286.) In the section addressing "the functional capacity . . . that best describes [the] patient," Dr. Tso noted that Plaintiff is "temporarily unemployable" and he expected that work-related activities with or without limitations could resume in six months. (R. 287.) According to a referral form dated December 15, 2011, Plaintiff was also referred to a hematology specialty clinic.[16] (R. 294.)

### B.  Dr. Desiree Chow, M.D.

On or about December 14, 2011, Plaintiff also had an appointment with Dr. Desiree

---

[14]  "Tachycardic" means having a rapid heart rate. *Tachycardic*, *Dorland's Illustrated Medical Dictionary* at (29th ed. 2000).

[15]  The report lists "TSH-3rd Generation," "SMA-12," "LIPD Profile, "Glyco HGB A1-C" and "CBC/DIFF/PLT." (R. 190.)

[16]  The referral form is not signed, but Dr. Tso appears to have initialed the bottom left of the form, as the initials present on the form are similar to his signature on other documents. (*See* R. 294, 363, 399.)

Chow, M.D., at the Ryan Center, to complete forms and review her lab results.[17]  (R. 188–89.)
Dr. Chow noted that Plaintiff refused to go to the emergency room because she felt okay and did
not have anyone to watch her children.  (R. 189.)  She noted that Plaintiff missed a prior
appointment in November of 2011, but Plaintiff stated she "felt fine" and did not have dizziness
or lightheadedness.  (R. 188.)  Dr. Chow noted that Plaintiff had no chest pains or shortness of
breath that day.  (R. 189.)

Similar to Plaintiff's appointment with Dr. Tso, Dr. Chow noted Plaintiff's past medical
history, including hypertension, anemia secondary to fibroids and heavy menstruation, anxiety,
depression, eczema and agoraphobia, and Plaintiff's 2007 blood transfusion for severe anemia.
(R. 188.)  She also noted that Plaintiff had quit smoking cigars the prior month.  (*Id.*)

Dr. Chow's notes indicate that she performed a physical examination and a review of
Plaintiff's "systems."  (*Id.*)  Plaintiff had no chest pain, shortness of breath, or abdominal pain,
but noted that Plaintiff had "anxiety depressed feelings."  (*Id.*)  Plaintiff's cardiovascular
condition was tachycardic and "S1, S2 normal, no murmurs, trace pitting edema . . . no carotid
bruit."[18]  (*Id.*)  Plaintiff's psychiatric examination showed good eye contact, normal speech, and
that Plaintiff was "appropriate, alert, [and] oriented."  (*Id.*)  Dr. Chow noted Plaintiff's
respiratory condition as "CTA B/L, no wheezes b/l."  (*Id.*)

Dr. Chow assessed Plaintiff as having anemia due to iron deficiency and hypertension,

---

[17]  Plaintiff's results returned "Hb 3."  (R. 188.)  "Hb" refers to hemoglobin.
*Hb*, *Dorland's Illustrated Medical Dictionary*.  However, the record provides no indication of
what a blood test result of "Hb 3" means, but the records note that upon receiving this result, the
Ryan Center apparently called Plaintiff.  (R. 189.)

[18]  Dr. Chow noted that Plaintiff had not yet completed an "echo," and requested that she
"return for close follow up."  (R. 189.)

and prescribed treatments for each condition. (*Id.*) Dr. Chow ordered a refill of Plaintiff's ferrous sulfate syrup, and requested multiple lab tests, including "CBC/DIFF/PLT"[19] "HEP C Antibody" and "HbsAg." (*Id.*) Dr. Chow also made an "urgent" referral to hematology to evaluate Plaintiff for pancytopenia. (R. 189.) Dr. Chow discussed prior lab results and informed Plaintiff that she would repeat Plaintiff's prior lab tests for "possible viral causes of marrow suppression." (*Id.*)

### C. Test results

Plaintiff's records from the Ryan Center include test results with dates corresponding to the October 25, 2011 and December 14, 2011 requests by Dr. Tso and Dr. Chow. (R. 196–98.) The notes indicate that after those requests, Dr. Meghan Greenfield, M.D., ordered the tests (*Id.*) The October 25, 2011 results list Plaintiff's hemoglobin at "3,0 (12.0·16.0 G/OL) LL" and hematocrit at "11.7 (38.0·47.0 %) L." (R. 196.) The December 14, 2011 results list Plaintiff's Hemoglobin at "4.2 (12.0-16.0 G/DL) LL" and Hematocrit at "17.7 (38.0-47.0 %) L." (*Id.*)

### D. Dr. Joanne Titelis, M.D. OB/GYN

Plaintiff also saw Dr. Joanne Titelis, a gynecologist at the Ryan Center, multiple times. (R. 186, 406–07.) On or about January 17, 2012, Plaintiff saw Dr. Titelis for her annual gynecological examination and in response to Plaintiff's complaints of "abnormal bleeding." (R. 186.) Dr. Titelis noted Plaintiff's medical history, listing Plaintiff's hypertension, anxiety, depressions, eczema and agoraphobia. (*Id.*) She also noted Plaintiff's 2007 blood transfusion for severe anemia. (*Id.*) Dr. Titelis further noted that Plaintiff was still taking ferrous sulfate as prescribed. (*Id.*) Based on a gynecological examination, Dr. Titelis determined that Plaintiff's

---

[19] "CBC" refers to complete blood count. *CBC*, *Dorland's Illustrated Medical Dictionary*.

uterus was irregular, enlarged, firm, and "nontender-20wks size." (*Id.*)  Dr. Titelis listed a number of treatments, including a routine gynecological examination,[20] mammogram screening, venereal disease testing and malignant neoplasm screening of Plaintiff's cervix.  (*Id.*)  Dr. Titelis also advised Plaintiff to keep her follow-up appointments.  (R. 186–87.)

Less than a month later, on or about February 3, 2012, Dr. Titelis completed a Wellness Plan for Plaintiff similar to Dr. Tso's December 14, 2011 Wellness Plan.  (R. 406–07.)  Dr. Titelis diagnosed Plaintiff with "uterine fibroids complicated moderate iron deficiency anemia." (R. 406.)  Dr. Titelis noted relevant clinical findings from Plaintiff's latest blood work.[21]  (*Id.*) Those findings appear to include a complete blood count result listing Plaintiff's hemoglobin at 4.2 grams per liter and her hematocrit at 17.7%.  (*Id.*)  They also note that Plaintiff is on a ferrous sulfate supplement.  (*Id.*)  Dr. Titelis prescribed a "clinical course," stating that Plaintiff needed a transvaginal ultrasound, an evaluation for possible gynecology surgery, and to follow up with a hematologist.  (*Id.*)  As to the hematology follow-up, Dr. Titelis noted that Plaintiff was "strongly urged to keep [the appointment.]"  (*Id.*)  Dr. Titelis noted that Plaintiff's condition was unstable, and concluded that she was unable to work for at least 12 months.  (R. 407.)

### 3.  Industrial Medicine Associates, P.C.

In 2012, Plaintiff visited two consulting doctors at Industrial Medicine Associates, P.C.

### A.  Dr. Irene Chow, D.O.

On or about February 6, 2012, Plaintiff visited Dr. Irene Chow, D.O. for an internal

---

[20]  It appears that although Dr. Titelis was performing a routine gynecological examination, she recommended an additional examination.  (R. 186.)

[21]  The section also has various undecipherable notations such as "Pap – Nil" and "HaPC AB Nil."  (R. 406.)

medicine examination based on a referral from the Division of Disability Determinations. (R. 371–74.) Dr. Chow noted that Plaintiff had anemia for fifteen years due to having a "fibroid uterus." (R. 371.) Dr. Chow further noted that Plaintiff was taking an iron supplement for the anemia, and had received a blood transfusion due to the anemia.[22] (*Id.*) Dr. Chow noted that Plaintiff was diagnosed with hypertension in 2003, but was not hospitalized or put on medication for the condition. (*Id.*) According to Dr. Chow, Plaintiff cooks and cleans "three times a week," does laundry "once every two weeks," and shops "once a week." (R. 372.) Plaintiff also showers and dresses herself each day, and "goes out for appointments, takes the children to school, and socializes with friends." (*Id.*)

Dr. Chow performed a physical examination of Plaintiff. Dr. Chow reported Plaintiff's blood pressure at "130/90," and recommended that Plaintiff follow-up with her doctor about her blood pressure. (*Id.*) She found Plaintiff was in "no acute distress," and that she had a normal gait and could walk "on heels and toes without difficulty." (*Id.*) Dr. Chow also determined that Plaintiff could "rise from the chair without difficulty," used "no assistive device," and needed no help changing for the examination or getting on and off the examination table. (*Id.*) She examined Plaintiff's abdomen finding it "firm to palpation" along with palpable firm masses due to fibroids. (R. 373.)

During Dr. Chow's musculoskeletal examination, she found Plaintiff's cervical spine and lumbar spine showed full flexion, extension, lateral flexion and full rotary movements bilaterally. (*Id.*) She did not find any scoliosis or kyphosis, or abnormality in Plaintiff's thoracic spine. (*Id.*) She found that Plaintiff's straight leg raising was negative, and that Plaintiff had full

---

[22] Dr. Chow listed Plaintiff's blood transfusion as occurring in 2006 rather than 2007. (R. 371.)

range of motion in the shoulders, elbows, forearms and wrists bilaterally. (*Id.*) Plaintiff had full range of motion of her hips, knees and ankles bilaterally, and found no evident subluxation, contractures ankyloses or thickening. (*Id.*) Plaintiff's strength was "5/5 bilaterally in the upper and lower extremities," and that her hand and finger dexterity was intact. (*Id.*) In addition, Plaintiff's grip strength was "5/5 bilaterally." (*Id.*)

Dr. Chow made five diagnoses: (1) "fibroid uterus," (2) anemia, (3) hypertension "on no medication," (4) psychiatric condition, and (5) active tobacco, alcohol and substance use. (R. 374.) Based on the examination, Dr. Chow gave Plaintiff a fair prognosis and found that Plaintiff had "no physical limitations," and deferred to a psychologist for evaluation. (*Id.*)

### B.  Dr. Robert Lancer, Psy.D.

On the same day as Dr. Chow's examination, February 6, 2012, Plaintiff also saw Dr. Robert Lancer, who completed a consultative psychological examination of Plaintiff. (R. 375–78.) Dr. Lancer noted that Plaintiff worked as a medical assistant until 2011, when she left due to depression and stress. (R. 375.) Plaintiff complained of having difficulty falling asleep, and was waking up approximately four times a night. (*Id.*) He diagnosed Plaintiff's "depressive symptomology" as dysphoric mood fatigue. (*Id.*) His notes indicate that Plaintiff denied having panic attacks, cognitive symptomatology," "anxiety-related symptomatology" or "manic symptomatology." (*Id.*) He noted Plaintiff's drug and alcohol history of abusing alcohol from 1977 to 2011 and cannabis abuse in 2011. (*Id.*)

Dr. Lancer also completed a mental examination, noting Plaintiff was cooperative, and had a "manner of relating, social skills, and [that Plaintiff's] overall presentation was adequate." (R. 376.) Plaintiff was dressed appropriately, was well groomed, had good posture, and made appropriate eye contact. (*Id.*) He noted that Plaintiff's recent and remote memory skills were

"intact," and that Plaintiff could complete "3 out of 3 objects immediately, 3 out of 3 objects after five minutes, 5 digits forward, and 3 digits backwards." (*Id.*) Regarding Plaintiff's thought processes, Dr. Lancer noted that Plaintiff was coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia in the evaluation setting. (*Id.*) Plaintiff's "general fund of knowledge" was appropriate to experience. (*Id.*)

Dr. Lancer noted aspects of Plaintiff's "mode of living." (R. 377.) He noted that Plaintiff could dress, bathe, and groom herself, cook and prepare food, complete general cleaning and laundry, manage money, and take public transportation. (*Id.*) Dr. Lancer further noted that Plaintiff had limited socialization, and spends her days watching television and taking her children to school. (*Id.*) Dr. Lancer concluded that Plaintiff's examination results "d[id] not appear to be consistent with psychiatric problems that significantly interfere with [Plaintiff's] ability to function on a daily basis." (R. 377.) Dr. Lancer diagnosed Plaintiff with alcohol and cannabis abuse in early remission, and high blood pressure. (*Id.*) He recommended that Plaintiff continue drug and alcohol treatment and vocational rehabilitation. (*Id.*)

### 4. "Kamin, E.," consultative examiner

On February 15, 2012, "E. Kamin,"[23] a psychology consultant, completed a SSA-2506-BK "Psychiatric Review Technique" form, which, as the form states, is "mandatory in disability claims involving mental impairments." (R. 380–92.) Kamin reviewed Plaintiff's psychiatric condition from April 16, 2011 through the date of his review.[24] (R. 380.) Kamin noted that Plaintiff complained of depression and anxiety, but was not taking psychiatric medication and

---

[23] The record does not include the full name of "Kamin, E."

[24] The form does not indicate whether he examined Plaintiff in person, or reviewed her medical records.

had not been hospitalized or admitted to a psychiatric facility.  (R. 392.)  Kamin further noted

that Plaintiff complained of depression and anxiety, but had no "psych TMD," "psych meds,"

"ER visits" or "in[patient] psych admissions."[25]  (*Id.*)

Kamin diagnosed Plaintiff with (1) an "Affective Disorder," listing subjective depression

as the "medically determinable impairment," (2) an "Anxiety Related Disorder," listing

subjective anxiety as the "medically determinable impairment," and (3) a "Substance Addiction

Disorder," listing Plaintiff's history of alcohol and drug abuse as the "medically determinable

impairment."  (R. 383, 385, 388.)  Kamin found that Plaintiff had "no degree of limitation" as a

result of (1) "restriction of activities of daily living," (2) "difficulties in maintaining social

functioning," (3) "difficulties in maintaining concentration, persistence, or pace," or (4)

"repeated episodes of deterioration each of extended duration."  (R. 390.)  Kamin noted that the

evidence did not establish the presence of the "C" criteria in the Social Security Administration

Regulations' Listing.  (R. 391.)

###### d.  Additional evidence

Plaintiff completed a "Disability Report – Appeals" form, which is dated March 23,

2012, where she lists additional medical information.  (R. 161–63.)  According to the form, since

Plaintiff's initial disability report, she had or planned to seek additional medical treatment.

(R. 161.)  Plaintiff listed Dr. Minola, from the Community Consultation Center, as having treated

and evaluated Plaintiff for depression, anxiety attacks and agoraphobia since 2012.  (R. 162.)

According to the form, Plaintiff saw Dr. Minola in March of 2012, and had an additional

appointment scheduled for April of 2012.  (*Id.*)

---

[25]  Kamin's notes list "inpt psych admissions," which is construed by the Commissioner
as indicating that Plaintiff had no inpatient admissions.  (Comm'r Mem. 7.)

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act. First, the ALJ found that Plaintiff had not engaged in substantial activity since April 16, 2011, the alleged onset date. (R. 18.) Second, the ALJ found that Plaintiff had the severe impairment of "anemia secondary to fibroids." (*Id*.) The ALJ found that Plaintiff also alleged back, leg and hip pain, but that "there is no medically determinable impairment for the back, leg or hip." (*Id.*) The ALJ found that Plaintiff was noted as obese but that "no doctor has indicated any limitations due to obesity." (*Id.*) The ALJ found that Plaintiff's "FEGS records indicate work imitations not applicable for physical," and that, "the record states psychological issue can be accommodated in low stress setting but claimant's activities are greater than stated limitations claimed." (*Id.*) The ALJ noted that Plaintiff had "non-severe impairments," specifically, "hypertension, depression, [and] history of substance abuse" that "have not caused more than a minimal impact on [Plaintiff's] ability to perform basic work activities." (R. 19.) Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the Social Security Regulations. (*Id.*) The ALJ considered Listing 7.00 for hematological disorders, and Section 7.02 for chronic anemia. (*Id.*)

Regarding Listing 7.00 for hematological disorders and Section 7.02 addressing chronic anemia, the ALJ found that Plaintiff's anemia secondary to fibroids "does not meet the requirements of 7.02."[26] In reaching this conclusion, the ALJ found that Plaintiff "can do all

---

[26] At the time of the ALJ's decision, Listing 7.00, which addresses hematological disorders, contained Section 7.02, which addressed chronic anemia. Under Section 7.02, chronic anemia was defined as "hematocrit persisting at 30 percent or less due to any cause" with either (A) "Requirement of one or more blood transfusions on an average of at least once every 2

activities of daily living" and notes that Plaintiff (1) "is a full time caregiver for her three

children" (2) can travel by public transportation," (3) "does all household chores," (4) "is

engaged and visits with her fiancé regularly." (*Id.*) The ALJ determined that Plaintiff's mental

status examination was "intact," and there were "no demonstrated marked or moderate limits."

(*Id.*)

Fourth, the ALJ determined that Plaintiff "has the residual functional capacity to perform

the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c)." (*Id.*)

Specifically, Plaintiff could "lift and/or carry 50 pounds occasionally and 25 pounds frequently;

stand and/or walk 6 hours [i]n a[n] 8-hour workday." (*Id.*) The ALJ also found that Plaintiff's

"medically determinable impairments could reasonably be expected" to cause Plaintiff's

---

months" or (B) "Evaluation of the resulting impairment under criteria for the affected body
system." 20 C.F.R. subpt. P, App. 1 § 7.02 (2011).

On November 19, 2013, the Social Security Administration published a Notice of
Proposed Rulemaking titled "Revised Medical Criteria for Evaluating Hematological Disorders."
*See* 78 Fed. Reg. 69324, 69324–69336 (Nov. 19, 2013). The rule proposed changes to, among
other things, the criteria in the Social Security Act's Listing of Impairments used to evaluate
cases of hematological disorders in adults and children. *Id.* at 69324. Under the proposed rule,
Section 7.02, including the chronic anemia criteria of "hematocrit persisting at 30 percent or less
due to any cause," would be eliminated, and, going forward, the Administration "would evaluate
anemia that results from an underlying hematological disorder under the appropriate proposed
listing for the disorder or under the functional criteria in proposed listing 7.18." *Id.* at 69325,
69328. The purpose of the proposed rule is to broaden the categories of hematological disorders
and move away from specific disorders, "so that [the Administration] can include more types of
hematological disorders." *Id.* The comment period for the rule closed on January 21, 2014, and
the final rule was issued on April 17, 2015, and became effective on May 18, 2015. *See* 80 Fed.
Reg. 21159 (Apr. 17, 2015).

The decisions of the ALJ and the Appeals Council denying Plaintiff's application were
made prior the new rule's effective date. Accordingly, the Court considers the ALJ's decision in
light of the regulation in effect at the time of the decision. *Lowry v. Astrue*, 474 F. App'x 801,
805 n.2 (2d Cir. 2012) (applying the regulation in effect at the time of the ALJ's decision despite
the Commissioner subsequent amendment); *Barnwell v. Colvin*, No. 13-CV-3683, 2014 WL
4678259, at \*9 (S.D.N.Y. Sept. 19, 2014) ("[B]ecause other provisions of the regulations were
substantively amended, I apply the version of the regulations in effect when the ALJ rendered his
decision." (citing *Lowry*, F. App'x at 805 n.2)).

symptoms, but found that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible "to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 21.)

In reaching this conclusion, the ALJ accorded the state physical consultative physician, Dr. Irene Chow, "substantial weight because [s]he opined [that Plaintiff] has no limitations, which [was] consistent with the medical evidence of record, and [Plaintiff's] actual functioning." (*Id.*)  The ALJ also gave the psychological consultative examiner, "Kamin, E.," substantial weight, "because he opined [that Plaintiff] has no limitations, which is consistent with the medical evidence of record, and [Plaintiff's] actual functioning."  (*Id.*)  The ALJ accorded "little weight" to Dr. Titelis' Wellness Plan, which concluded Plaintiff could not work for twelve months, because the Wellness Plan was "supported neither by the objective evidence nor the claimant's own description of her abilities."  (*Id.*)  The ALJ found that Plaintiff had "no significant problems with her activities of daily living," and referred to Plaintiff's testimony that she could take public transportation, and help her five-year-old son, but "sometimes needs assistance physically (not indicated as a psychological problem.)"  (R. 20.)  The ALJ made no determinations concerning Plaintiff's psychological symptoms or alleged impairments.

Finally, the ALJ determined that Plaintiff was capable of performing her prior work as a nurse midwife, which required a medium exertional level, as a medical assistant, which requires a light exertional level, and as a switchboard operator, which is a sedentary exertional level, as none of this work required Plaintiff to perform activities precluded by her residual functional capacity.  (R. 21.)  The ALJ further determined that even if Plaintiff was limited to light work and avoided "unprotected heights and machinery," Plaintiff could perform her past relevant work.  (*Id.*)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Substantial evidence requires "more than a mere scintilla." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran*, 569 F.3d at 112 (citation omitted). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *see McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act

is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Act. To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the

[Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c.   Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ correctly evaluated the medical evidence and correctly determined Plaintiff's credibility.  (Comm'r Mem. 9–16.)  The Commissioner further argues that even if Plaintiff was limited due to any impairment, there are jobs in the national economy that Plaintiff could perform.  (*Id*. at 16.)  Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ (1) improperly discounted the opinions of Dr. Titelis, Plaintiff's treating physician, (2) failed to develop the record of Plaintiff's mental illness and (3) did not properly evaluate Plaintiff's credibility.  (Pl. Mem. 2.)

### i.   Treating physician rule and the duty to develop the record

Plaintiff contends that the ALJ erred by (1) according the opinions of Plaintiff's treating physician, Dr. Titelis, "little" weight even though it was supported by corroborating evidence, and (2) according "substantial" weight to the opinion of the Commissioner's consulting doctor, who, unlike Dr. Titelis, lacked relevant expertise in gynecology.  (Pl. Mem. 13–16.)  The Commissioner argues that the ALJ properly determined Plaintiff lacked a disability and accorded Plaintiff's treating physician's opinion "little" weight, given the conclusory nature of the opinion and lack of support in the record.  (Comm'r Mem. 15.)  The Commissioner further argues that the consulting physician's examination and Plaintiff's own testimony supported the ALJ's finding that Plaintiff was not disabled.  (*Id*. at 13–15.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors in determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362

F.3d at 32 (discussing the factors). The ALJ must set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz*, 912 F.2d at 11); *see Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion.[27] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v.*

---

[27] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order).

*Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. Mar. 22, 2013) (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

For the reasons discussed below, the Court finds that the ALJ (1) failed to adequately explain his reasons for affording little weight to the medical opinion of Plaintiff's treating physician Dr. Titelis, thereby violating the treating physician rule, (2) failed to develop the record with respect to the medical opinion of Plaintiff's other treating or examining physicians, Dr. Tso and Dr. Branker, and (3) failed to develop the record with respect to Plaintiff's

psychological disorders.

### 1. The ALJ did not properly address Dr. Titelis' findings

The ALJ found that Dr. Titelis, a gynecological specialist, was Plaintiff's treating physician at the Ryan Center, but accorded little weight to Dr. Titelis' opinion contained in the February 3, 2012 wellness plan. (R 21.) Dr. Titelis' opinion came after numerous appointments at the Ryan Center, where Plaintiff was seen by Dr. Titelis, Dr. Chow, and Dr. Tso. (R. 186, 188–90, 406–07.) In the Wellness Plan, Dr. Titelis diagnosed Plaintiff with "uterine fibroids complicated moderate iron deficiency anemia," noted her "latest blood work results," and detailed a "clinical course" of treatment recommending a transvaginal ultrasound, evaluation for gynecological surgery, and a "strongly urged" follow-up with a hematologist. (R. 406.) Finding that Plaintiff's diagnosis was unstable, Dr. Titelis concluded that Plaintiff was unable to work for at least twelve months. (R. 407.) Nevertheless, the ALJ assigned little weight to the entirety of Dr. Titelis' Wellness Plan, finding that it was "conclusory," described no functional imitations, and was not supported by the objective evidence and Plaintiff's testimony. (R. 21.)

In reaching this conclusion, the ALJ appears to have implicitly considered ways in which Dr. Titelis' opinion was not supported by the objective medical evidence and testimony, but the ALJ erroneously failed to acknowledge the ways in which Dr. Titelis' opinion *was* consistent with the objective medical evidence. *See Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support Dr. Schwarz's opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to Dr.

Schwarz's opinion was lacking."); *Larsen v. Astrue*, No. 12-CV-00414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspects of [the treating physician's] findings and ultimate conclusions, . . . the ALJ did not elaborate on how this evidence affected the weight accorded to [the treating physician's] opinions.").

The ALJ ignored clinical testing evidence consistent with Dr. Titelis' Wellness Plan. When Dr. Titelis created the Wellness Plan in February 2012, Plaintiff had undergone two blood tests that returned abnormal results. (R. 186–98, 399–417.) Those blood tests revealed abnormal levels of, among other things, hemoglobin and hematocrit, and these results feature prominently in Dr. Titelis' Wellness Plan as she cites Plaintiff's hemoglobin and hematocrit levels of 4.2 G/DL and 17.7% to support the diagnosis of "uterine fibroids complicated moderate iron deficiency anemia." (*See* R. 196–98, 406–07.) Despite substantiating the Wellness Plan with this information, the ALJ never mentions or considers the abnormal blood tests, nor did the ALJ evaluate Dr. Titelis' reliance on them.

These abnormal blood test results were similarly considered by other Ryan Center physicians whose opinions the ALJ also ignores despite their corroboration of Dr. Titelis' Wellness Plan. Dr. Alan Tso treated Plaintiff on two occasions at the Ryan Center — first as a "walk-in," when Dr. Tso ordered blood tests, and then to provide Plaintiff with a Wellness Plan. (R. 190–91, 286.) At the first appointment, Dr. Tso diagnosed Plaintiff's "hx of severe anemia due to uterine fibroids," and noted he would "re-check [Plaintiff's] C[omplete] B[lood] C[ount] today to follow up." (R. 191.) In addition, Dr. Tso's December 14, 2011 Wellness Plan came after Plaintiff's October 25, 2011 blood test and coincided with her December 14, 2011 blood test, which were both abnormal. (R. 196.) Like Dr. Titelis' subsequent findings, Dr. Tso

diagnosed Plaintiff with "uterine fibroids complicated moderate iron deficiency anemia" and concluded that she was "temporarily unemployable" for six months. (R. 286–87.) In assigning Dr. Titelis' Wellness Plan little weight, the ALJ makes no reference to these findings.[28]

The ALJ also ignored the opinions of Dr. Desiree Chow from the Ryan Center, who also noted serious issues in Plaintiff's blood test results. Notes from Plaintiff's December 14, 2011 appointment show that Dr. Chow attempted to call Plaintiff and refer her to an emergency room visit when her blood tests revealed problematic hemoglobin results of "Hb 3." (R. 189 ("Pt was called when lab result returned with Hb 3. She refused ER visit because she felt OK . . .").) At that appointment, Dr. Chow "urgent[ly]" referred Plaintiff to hematology for further evaluation. (*Id.*) Despite Dr. Chow expressing concerns about Plaintiff's blood test results similar to those of Dr. Titelis' Wellness Plan, the ALJ makes no reference to these results in finding Dr. Titelis' Wellness Plan conclusory and lacking corroboration by objective evidence.

The FEGS records of Dr. Branker's treatment of Plaintiff reflect a similar concern with abnormal blood test results independent of the Ryan Center results; however, in concluding that Dr. Titelis' opinions lacked any objective support, the ALJ wholly ignores these corroborating facts. (R. 228–30.) Dr. Branker signed Plaintiff's abnormal lab test results, which, like the Ryan Center tests, revealed abnormal levels of hematocrit and hemoglobin levels. (R. 229.) Dr. Branker attempted to call Plaintiff about these results and asked Plaintiff to return her call "right away." (R. 230.) Dr. Branker also referred Plaintiff to "PCP – Routine," "PCP – Emergent" and "ER" to follow up on these abnormal results. (R. 233.) In according Dr. Titelis' opinion little

---

[28] In a separate part of his determination, the ALJ refers to Dr. Tso's note that Plaintiff had "no acute complaints" on October 25, 2011, but fails to mention Dr. Tso's later note that that Plaintiff would get shortness of breath when climbing stairs, and, since August, had to stop walking "every few blocks." (R. 190.)

weight, the ALJ makes no reference to Dr. Branker's similar blood test findings.

In addition to ignoring these corroborative clinical findings, the ALJ also ignored medical opinions that should have informed how much weight the ALJ should have assigned to Dr. Titelis' Wellness Plan. After noting Plaintiff's clinical results, Dr. Branker recorded an "employment disposition" similar to Dr. Titelis, finding that Plaintiff's "sig anemia due to fibroids" required treatment and stabilization before "she [was] medically cleared." (R. 232.) The ALJ seemingly ignores Dr. Branker's employment disposition finding; instead, the ALJ selectively cites Dr. Branker's note that Plaintiff had "[full range of motion] in all periph[eral] j[oints] and the spine," and that Plaintiff's psychological issue "can be accommodated in low stress setting." (R. 18, 232.) Further, the ALJ wholly ignored the stated opinion of Jorge Farrat contained in the FEGS records, which diagnosed Plaintiff with unstable uterine fibroids complicated with severe iron deficiency anemia, and concluded, like Dr. Titelis, that Plaintiff therefore had "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make [Plaintiff] unable to work." (R. 45.) Rather than addressing these opinions, the ALJ states cryptically, "FEGS records indicate work limitations not applicable for physical." (R. 18.) Although medical source opinions regarding functional limitations or disabilities are not binding, these conclusions were made with the benefit of substantial medical documentation and testing, none of which the ALJ addressed in his determination.

By wholly ignoring the clinical blood test results and other evidence corroborating Dr. Titelis's Wellness Plan and by selectively focusing on facts to conclude that Dr. Titelis' Wellness Plan lacked support, the ALJ failed to provide good reasons for according Dr. Titelis

little weight. This failure violates the treating physician rule, and warrants remand.[29]

## 2. ALJ's duty to develop the record of Plaintiff's mental impairments

Plaintiff asserts that the ALJ failed to develop the record of Plaintiff's mental impairments. In her disability application, among the five medical reasons Plaintiff listed as "limit[ing] [her] ability to work," were anxiety, agoraphobia and depression. (R. 135.) At the start of Plaintiff's administrative hearing, Plaintiff's counsel informed the ALJ "the psychiatric aspect of the case is not really reflected in the file. Ms. Alvarez does go to a treating psychiatrist . . . ." (R. 29.) Throughout the ALJ's decision, he notes that the record contained evidence of unspecified psychiatric conditions and that Plaintiff underwent psychology examinations, but in making his determination, the ALJ only makes a passing reference to Dr. Branker's note that Plaintiff's "psych issues can be accommodated in a low mental stress work setting," and relies heavily on the non-examining consultative evaluation performed by "Kamin E." (R. 18, 20–21, 380–393.) According to the ALJ, Kamin's consultative examination was entitled to "substantial weight" because Kamin "opined [that Plaintiff] has no limitations, which

---

[29] In addition to failing to consider their opinions as corroborative of Dr. Titelis' Wellness Plan, the ALJ did not address whether Dr. Tso, Dr. Chow, Dr. Branker, and Farrat qualified as treating sources. The record is unclear as to the total number of times each doctor examined Plaintiff. Accordingly, on remand, the Commissioner should evaluate whether these doctors should be considered treating sources, develop the record as necessary, and accord any treating physician's opinion appropriate weight. *See Estela-Rivera v. Colvin*, No. 13-CV-5060, 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015) ("'Regardless of its source,' Social Security regulations require that 'every medical opinion' in the administrative record be evaluated when determining whether a claimant is disabled under the Act." (quoting 20 C.F.R. ¶¶ 404.1527(d), 416.927(d))); *Emsak v. Colvin*, No. 13-CV-3030, 2015 WL 4924904, at *11 (E.D.N.Y. Aug. 18, 2015) ("Nowhere on the record did the ALJ discuss the merits of Ms. Phillips's opinions, which, notably, were consistent with Ms. Carr's opinions. Therefore, the ALJ erred by failing to weigh every medical opinion, as required by 20 C.F.R. § 416.927(c)."); *Bolden v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 152, 165 (E.D.N.Y. 2007) ("[T]he ALJ must always give good reasons in her decision for the weight accorded to a treating source's medical opinion." (internal quotation marks omitted) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998))).

is consistent with the medical evidence of record, and claimant's actual functioning." (R. 21.)

The ALJ found Kamin's opinion consistent with the record because the ALJ failed to consider other relevant evidence of Plaintiff's mental impairments or obtain records from Plaintiff's treating psychologists. Because "[i]n the case of mental disabilities, '[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function," the ALJ needed to "review all pertinent information relative to [Plaintiff's] condition . . . ." *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) (quoting 20 C.F.R. Pt. 404, subpt. P, App 1 § 12.00(E)). Here, even when raised by Plaintiff's counsel at the hearing, the ALJ still overlooked evidence and failed to develop numerous parts of the record relating to Plaintiff's mental impairments.

The ALJ was aware that Plaintiff received ongoing psychological treatment from at least two doctors. As reflected in the FEGS medical records, Dr. Thomas Cullinan had been treating Plaintiff for anxiety for approximately three months. (R. 217, 242.) The FEGS records contained Dr. Cullinan's contact information. (*Id.*) In her disability report, dated March 22, 2012, Plaintiff listed contact information for "Dr. Minola" at Community Consultation Center, who had been treating Plaintiff for depression, anxiety attacks and agoraphobia since sometime in 2012. (R. 162.) Further, during her testimony, Plaintiff stated that she was then being treated by a psychiatrist once a month and a therapist once a week for "stress, fatigue, anxiety and . . . agoraphobia." (R. 40.) Despite having record evidence relating to Plaintiff's mental health issues, the ALJ failed to obtain any records from Plaintiff's treating mental health professionals. Indeed, the ALJ's determination is nearly devoid of reference to Plaintiff's mental health.[30]

---

[30] In addition, the ALJ's decision does not reflect consideration of available evidence about Plaintiff's mental health. Specifically, the ALJ assigned no weight to the opinions of Dr.

In order to satisfy his threshold duty to develop the record, the ALJ had an obligation to obtain an opinion from Plaintiff's medical sources, including Dr. Cullinan, Dr. Minola, and the doctors Plaintiff's referenced in her testimony. *See Pabon*, 273 F. Supp. 2d at 514 ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability." (alterations in original)); *Dimitriadis v. Barnhart*, No. 02-CV-9203, 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004) ("[T]he ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability."). This duty is heightened because Plaintiff claims that she is disabled by a mental impairment. *See Sanchez v. Comm'r of Soc. Sec.*, No. 13-CV-3270, 2014 U.S. Dist. LEXIS 115153, at *40 (S.D.N.Y. Aug. 15, 2014) ("The ALJ's duty to develop the record is heightened when the disability in question is a psychiatric impairment."); *Camilo v. Comm'r of the Soc. Sec. Admin.*, No. 11-CV-1345, 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) ("[I]t is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment."). Although Plaintiff's testimony and reference to Dr. Minola post-dated Plaintiff's application for benefits, this did not relieve the ALJ of his duty to develop the record. *See Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (finding that the ALJ failed to develop the record where "[a]t the hearing, plaintiff clearly indicated that she was being treated at both NYU and St. Luke's. The ALJ sought medical records from St. Luke's from 1991 to the present, but made no similar request to NYU."); *Scott v. Astrue*, No. 09-CV-3999, 2010 WL 2736879, at *14 n.60 (E.D.N.Y. July 9, 2010) ("[T]he ALJ is responsible for developing a full and complete record between the time that elapses between

_____

Tso and Dr. Chow from the Ryan Center, despite their notes on Plaintiff's complaints of anxiety attacks and their referral for a psychiatric evaluation of Plaintiff. (R. 188, 190–91.)

plaintiff's application and plaintiff's hearing date." (citing *Pettey v. Astrue*, 582 F. Supp. 2d 434, 437 (W.D.N.Y. 2008))).

Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011) (Where the ALJ fails to develop the record, "the Court need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence." (alteration in original)); *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999). Instead, where the ALJ has failed to fully develop the factual record, the proper remedy is to remand the case for further proceedings. *See Butts*, 388 F.3d at 386; *Mantovani*, 2011 WL 1304148, at *4.

Accordingly, this case is remanded pursuant to 42 U.S.C. § 405(g) for the ALJ to contact Plaintiff's treating physicians to determine the nature, extent and severity of Plaintiff's mental impairment and what, if any, limitations are imposed by her alleged mental impairment and to consider the record evidence from Dr. Tso, Dr. Chow, and Dr. Branker regarding Plaintiff's mental impairments.

### ii.  Credibility

Plaintiff argues that the ALJ erred in finding that she was not credible as to the intensity, persistence, and limiting effects of her impairment because relevant evidence from Plaintiff's treating sources was not contained in the record. (Pl. Mem. 20.) Because the Court remands this case for further development of the record of medical sources' opinions as to Plaintiff's mental and physical impairments, the Court will not address Plaintiff's remaining arguments, as the ALJ's errors impact the Court's ability to review the credibility determinations.

**III. Conclusion**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 23, 2015
       Brooklyn, New York